I am your honor. Thank you. I appreciate it and may it please the honorable court and of course my esteemed opposing counsel Mr. Fitz and Meyer. I'm here to talk about two big overarching issues your honors. The first one is what is reasonable from the standpoint of law enforcement searches and seizures when they have obtained a search warrant related to a residence and they have learned that the person has relocated to another residence. When what is reasonable as far as going ahead and going forward with the search warrant that they obtained on the previous residence. The second issue the big issue I want to take up has to do with when your roommate is the target of a narcotics investigation and no evidence is developed against you is your vehicle the rightful subject of a search of premises even if question one the answer to that is the original search warrant still had probable cause. So I'm going to take those up in that order your honors. What you had with reference to the first question is you had an ongoing narcotics investigation based on what's in the search warrant and the testimony adduced at the suppression hearing and at trial. What we learned was that an was being investigated from around February of 2018 through August. Mr. Ray can I sort of cut to the heart of the matter on your first issue please? Yes sir. And that relates to the question of when they knew that the target if you'll use that phrase of the investigation and since my Spanish is not very good that's an easier way to phrase it when the target of the investigation had left that home and had relocated to another home. I mean you had the testimony of the agent at the suppression hearing saying they did not know that he had left the home and relocated until they were actually executing the search. And the district court found that testimony to be credible and given that what basis is there to view that as clearly a clearly erroneous finding and if it is not a clearly erroneous finding then that's the governing factual scenario that's the universe that they did not know at the time that they executed the search warrant that he wasn't there. Judge when you look at the search warrant that agent Paylott obtained and it's the same agent all the way through he obtained another search warrant against the second residence on November 28 shortly before they executed against that residence and in that search warrant his statement of probable cause which was also sworn testimony was that they had been conducting the surveillance to ascertain the current residence of Angulo the other individual and they had eyes and electronic surveillance on him at the target location for at least three days before they did the surveillance and your honor there was no evidence that he ever had gone back to 9000 Zuni. So you have what agent Paylott was trying to say and back away at the suppression hearing but then you have what he said under oath in his search warrant application for the location so he's essentially got two search warrant applications out there saying what the residence of Angulo is and saying we found him and look and can I can I stop you let me divide those up as it relates to the second search warrant was that within the universe of information that the district court had when it made its decision on the the suppression order. Absolutely absolutely judge it's it's in the briefing to the district court and and it's and it was discussed at the hearing judge. Okay okay well as it relates to those two warrants I mean there's no necessary inconsistency between those two things you're you're you're conducting surveillance as to where his current residence is you don't know that his current residence is they said they pinged him on two days before before they search on the 28th right at being at this dam residence all right so he was there they it's been accepted by the district court that he frequented that location but there there's that's different is it not from adopting that as his residence or knowing that that's his residence. Your honor I believe that the and he put it this way because he wanted to be able to search the new residence was that they had surveilled and obtained the evidence to ascertain Angulo's new residence and that they had seen him there on the days before and he never mentioned him going back to the other place so we're when judge Parker said the evidence was that Angulo frequented the location that actually wasn't what the affidavit said it said that they were ascertaining his new residence and they found him there on multiple days and they executed against that residence as if it was his new residence. Mr. A? Yes your honor. Mr. A? I think given the statement in the affidavit for the second search warrant that the judge could have drawn the inference you're drawing the judge didn't. I think what may be determinative or at least certainly very relevant is what information had the officers obtained between the time they got the first search warrant and the time they searched the mobile home. Tell us what that is because from that we can decide whether the officers would likely have inferred that he moved or not. My understanding is there's some pings they got they got a warrant or some device to just learn where his cell phone was but they only got that information for a couple days before the searches were executed. Is that right? Your honor I don't think it's a hundred percent right because and this goes to the government's witness trying to in some ways not reveal everything that was going on and that wasn't all case strategy on his part. There was a lot of questioning of him about what methods of surveillance they were using on Angulo and how often they were watching him. He indicated that they had a lot of surveillance eyes on and electronic on Angulo and when I pressed him on exactly what and when he said I can't reveal all of my methods and I respect that. What do you mean you respect that? That sounds like it's very relevant to this fact. Why didn't you pursue that? We did pursue it judge and he wasn't willing to reveal his surveillance methods so what he was left with... Wait wait wait if he's not willing to answer the question that's relevant to this subject why don't you ask the and we knew from his affidavit that that Fernando Topete Madrueno never went back to 9000 Zuni and he said in his testimony... Why do you say that? We're talking about from the date of the getting the first warrant until that warrant was executed how did they know that Angulo had never gone back to the trailer? Your honor because agent Pilot had he told us that he had eyes on surveillance on Angulo throughout that kind of period in November. Now I do have to see... Before you concede would you say that period in November that limited time between when the warrant was obtained and when it was executed is that what you're saying? Yes judge so here are the days... He said he had eyes on during that period. Yes judge and he also said they had the electronic pings and then he said there were other methods of surveillance that he didn't tell us what they were. But if they had those eyes on those eyes on revealed that there was no indication that he had moved luggage or he had done anything that suggested that he had left that place that's what he testified to at the suppression hearing. I mean adopting the proffer of the prosecution as his own testimony that's what he said. Judge again that's not consistent with his search warrant affidavit on the new residence which they then searched on the premise that that was the new residence. Well let me let me just move beyond that to to suggest this even if one assumed that he had moved two days before they executed the search warrant why was it they're not a fair probability that there would be evidence of drug trafficking at that home? I mean the whole premise of the investigation was that that home was a stash house and just because he moved his own residence would not necessarily mean by any stretch of the imagination would seem to me that there wouldn't be some evidence of drug trafficking at that home and so why why isn't there a fair probability and if if your answer I assume will be no what's what's the best case you have to suggest that isn't right? Judge Holmes so when the government says that there was evidence that that was a stash house their evidence of it being a stash house was actually not that strong. Remember your honor they never observed any drug trafficking happen at that residence. What their evidence showed was that this individual Angulo was going to other locations to conduct controlled buys. Now is that does that mean that that place is a stash house? I don't think that's a reasonable inference judge but at the same time remember we're talking about you're a roommate who no evidence has been developed against you over eight months of you being under surveillance and and that's that's even evident in the search warrant application yet your roommate moves out. How is it plausible that with no drug trafficking ever seen happening at that place that now you are going to see your residence door kicked down you raided and held because your roommate who moved out a few days ago did drug transactions off-site over the last eight months? Let's try this the investigation at least reading the affidavit suggested that this was sort of a delivery kind of deal. Angulo would deliver narcotics and so if he gets a call I mean if there's an arranged setup for the UC let's use the two UC transactions he there's a call he leaves he leaves Zuni and goes to drop off narcotics why isn't it a fair inference that the place he was holding the narcotics was at the residence? I mean you know it doesn't have to be beyond a reasonable doubt here we're saying I mean it seems like and phrasing in a different way why isn't it plausible for the adopt that reading of the facts that this was a stash house and if it was a stash house why would two two days make all that much difference? Judge anything that the district court adopts and I um has to be supported by evidence and reasonable inferences from that evidence and what and what what I'm talking about is that it may be true Angulo had drugs was drop offs but now what is being asked by the government is to make a further inference that when Angulo moves out that he left behind valuable contraband um in a place where he no longer lives and where the and from the police perspective where the person living there they haven't developed any evidence against him so they're just jumping to a conclusion without evidence that somebody who against whom there is no evidence developed has become the caretaker of valuable narcotics and that is an inference I believe was not reasonable for the district court to make. Could I skip ahead to your second issue and and here let's go to the to the to essentially the worst case scenario for the government and the worst case scenario is that we're relying on the good faith exception I which the district court didn't reach it I I'm having a when I'm talking about the search now of the edge I I'm having a hard time seeing why there isn't an why a reasonable officer could not rely on that warrant and affidavit to search the edge specifically because the the affidavit specifically included cars adjacent to the home as places where you store narcotics and other evidence of drug trafficking and the car was next to the home it had been regularly next to the home and and they mentioned the edge so I mean worst case scenario there wasn't probable cause why wouldn't a reasonable officer be able to rely on that affidavit and warrant when and there don't seem to be the exact exceptions to the good faith uh exception at play here so I'll stop there explain that to me why not the good faith exception if we need if the government needed to rely on that your honor because the good faith goes to the officer's knowledge and understanding of what what is the probable cause in the situation and we know it is undisputed that the officers did not develop any probable cause related to Mr. Topete Madronio or his car so to the extent that his car was mentioned in the in the um in the and the officers knew this when they when they applied for the warrant and when they get the warrant back that is a fact that that they have had within their reach for eight months and so they know that they don't have probable cause against that car or that person so when they put their formula of cars and vehicles and you know outlying buildings they know that they're that have access to that car so judge what what would happen if we if we allowed this type of search is that officers could just draft a generic search warrant um where multiple people live in a house and only one of them is a target and just use their formula for vehicles and every roommate who has a has a has a roommate that's up to bad action well maybe your car gets searched just your roommate is in trouble and that is unreasonable that is the standard of the fourth amendment and um and again judge these searches are invasive and they mr ray your time has expired so just uh maybe judge homes has follow-up questions but don't i do not do too much yeah yeah focus that that's what i have judge homes and my time is expired well i i think i know judge backer has a question did you say you had follow-up judge homes i did no no okay judge backer i did want to follow up on judge holmes uh question in regard to your last answer agent palat identified all of that information in his affidavit he he he he he painstakingly detailed the two uh uh uh sales uh that angelo made in the ford fusion there's reference uh several references to the ford edge it's clear from the affidavit of agent palat that that that angelo was not using the ford edge he was using the ford fusion so isn't your argument you make a good argument but isn't the flip side of that is that agent palat when he and other agents are executing the search warrant that does expressly cover vehicles on the premises including the edge that they're entitled to rely on what magistrate judge ritter said because he knew all of this information that you just identified that that that that angelo had never been seen in the ford edge and yet he still authorized a search of the ford edge so doesn't your art the flip side of what you just said support the the the point that judge holmes is making this that the good faith exception would support um uh uh introduction of the heroin seized from the edge um no your honor because at bottom the officers who are the ones obtaining the warrants and doing the surveillance and conducting these searches and seizures are ultimately responsible for the facts that they present and then what they know is probable cause or isn't so this is a situation where it was just drastically unreasonable to conduct the search and the officers would know it and anyone else would thank you mr thank you mr is it feisenmayer it is fits in my honor fits in my i'm sorry thank you go ahead good morning your honors and may it please the court and mr ray my name is mark fitzenmayer and i represent the united states the defendant has raised four issues i'm going to address each in turn and ask for questions before moving on to the next issue with regard to the first issue this court should affirm the district court because it did not clearly err when it found the agents did not know angulo had moved until after they executed the search warrant at 9 000 zuni and the district court correctly concluded that angulo frequenting 710 dan did not nullify a fact material to probable cause probable cause must exist from the issuance of a warrant until its execution probable cause will cease to exist where a material fact to the probable cause determination is nullified so here we have a search warrant for 9 000 zuni that was issued on november 18th and then executed on november 28th in between those two dates on november 26 law enforcement agents began receiving cell phone location information showing that angulo had been frequenting 710 dan they however did not know that this meant he moved until after they executed the warrant at 9 000 zuni and to answer judge holmes's questions with regard to the information in the dan warrant describing it as his residence that's because the 9 000 zuni warrant was executed early in the morning at the break of dawn and then the 710 dan warrant wasn't obtained until after that and in that warrant the 710 dan warrant they specifically talk about how they actually already arrested angulo at that point in time they arrested him talked to him and he said yes i had moved this is my new residence so that's why they used the term his residence that one time because he had in fact confirmed it himself okay so so the information in the second warrant was based upon actually information gleaned from angulo and the search that was predicated on the first one yes your honor and that's in volume one page 86 it's paragraph 49 of the 710 dan warrant now is submitted as government exhibit one at the suppression hearing well do you have the language that uh mr ray relied on in the second warrant that was problematic because i i thought it indicated that they'd been looking for his new residence or to confirm the new residence before the first warrant was executed do you have that so they hadn't been looking for the residence where he was living they were looking for him at this point in time when the warrant was being when they obtained the warrant they were trying to locate all the individuals they lost track of some because the the investigation kind of stalled there were some individuals in california uh things of that nature so i believe the 710 dan warrant shows an evolution of them looking for these people uh getting the pings that indicated that mr angulo was at 710 dan uh executing the 9000 zuni war and then confirming that he was in fact at 710 dan and that was his new residence mr ray spoke in terms of there having been continuous surveillance of mr angulo from the time that the first warrant was obtained what is your understanding of the other i think that um muddies some of the water with regard to uh the investigation so it my answer to that is this during the investigative portion of this uh particularly in like that summer there was more heavy surveillance then there was a state arrest of some of the members of the organization and they sort of dropped contact with law enforcement and law enforcement uh decreased surveillance because there was nothing happening in the case by the time they issue the warrant um they haven't had a whole the surveillance isn't as intense and by the time the warrant is issued uh they have lost track of some of the members and they're not sure where everybody is because uh as i mentioned some that somewhere in california um they have angulo but they also use the um cell phone location information to try and track him down which indicates that he may actually also be in a a different location during some times but he was seen in between those two time frames on november 20th at the 9000 zuni residence so it shows him going to both places during that time between the issuance and execution you talk about how long had they had the technology to be able to get pings for mr angulo's angulo's location so agent uh pilat in the suppression hearing mentioned that they applied for uh the warrant i believe around the 20th but didn't get any information for it until the 26th so they had the 26th and 27th what do you mean didn't get any information for it uh sometimes it takes the technology i believe uh he explains as well it takes the technology companies a little while to get it up and then for them to get the information to them so there's there's a lag between issuance of the warrant for the location information and the actual they didn't get the ping information until two days before the search was executed is that right correct special agent pilat specifically stated that um it wasn't until and was there any visual surveillance of mr angulo during the days before execution of the second war i do know that on the 26th and 27th they i believe they uh surveilled the new location but i don't recall if they saw him there or not and there's no evidence of anything being moved from the trailer to the new location is that correct correct and so that the defendant's argument must fail for two reasons first it's entirely predicated on the agents knowing for a fact that angle had moved to 710 dan as this court has noted already that is directly contrary to the district court's finding and there's nothing on the record to indicate that they clearly aired they have factual support for that secondly here's the language i think it's paragraph 49 the affidavit mr ray cannot have said if that's what he was referring to it says on november 26 2018 agent that i conducted surveillance to determine rodriguez velasquez's current residence as part of the investigation that's strange language to use if they thought he was still at the trailer on the 26th i don't i don't agree with that characterization i believe because at the time they're asking for this warrant they know he has the new residence at 710 dan so to the extent it's like a typographical error they're working in the present tense in that document because as that same paragraph notes they have arrested him he has confirmed uh that he lives at 710 dan at that point in time but this is all the way after the 9 000 warrants are executed thank you and then finally the other reason that this uh argument must fail is that as this court has also noted this is more than just a search for angulo this wasn't just like an arrest warrant for him this was a search of a residence for drug evidence and so just because mr angulo wasn't at 9 000 anymore doesn't mean he took all the evidence with him and special agent pilat specifically testified on page 50 of volume 3 that he believed uh at the time they were executing the warrant even if he wasn't there they would have been able to find uh some drug trafficking evidence there and barring any additional questions from the court on this particular issue i will move on to the second issue which you in terms of the car yes your honor good so with regard to the second issue this court should affirm the district court's finding that the defendant did not establish standing because there was no evidence of a subjective expectation of privacy nor was there any evidence of lawful possession such that society would be objectively willing to recognize it go ahead judge becker i'm sorry sorry judge uh in terms of an expectation of privacy so um the uh the defendant mr tapete uh tells uh the agents you can return the car uh to you know the owner of the car but i didn't see anything in this prescient hearing about returning the contents of the vehicle uh of the vehicle obviously he's not going to say return the heroin uh you know i want that heroin back but there was a self exhibit c to the affidavit or to the warrant does identify a cell phone that was located in the ford edge and there's nothing about him saying give that cell phone to anybody else in fact the record is silent about uh what he what what he said about returning the contents of the vehicle he had been surveilled uh pretty consistently as you point out from november 20th to the date of the execution of the warrant i think on the 28th there had never been any mention in the suppression hearing or in the affidavit about angulo being seen in that ford edge and so why is it that there was uh anything other than uh a reasonable expectation that that that tapete tapete did have permission to use that vehicle nobody had ever insinuated given any reason to believe that he had stolen the vehicle and be a little bit strange to say yeah return the vehicle to the guy that i stole the car from so with regard to the uh ownership of the items in the vehicle uh your honor is correct in that there was no evidence that he ever claimed any ownership of it or was he also or was asked uh anything about it you know i mean in other words you're right he never said give me the cell phone back but nor is there any information that he didn't do it the record is just completely silent about that correct your honor and it's it's his burden to establish standing and i think that's uh the easiest way to decide that particular issue is he didn't establish it then or at the hearing and therefore it doesn't fall in his favor similarly let me let us talk about standing with respect to the search of the vehicle with uh don't have standing if you are if you possess the vehicle with the permission of the owner yes your honor and can't you infer that he had the permission of the owner from the facts here the long use of it in the same area uh where the owner was i mean we look at all the facts not just the facts known at time of the search for standing we looked at the record when the judge rules on standing but i would think it's a very reasonable inference that he had the permission of the owner to use this vehicle your honor and i i would say that another inference is that it was potentially stolen or that it was potentially under duress and the fact that they were making these inferences and and these guesses shows that he did not meet his burden with regard to that particular aspect of this analysis was there any evidence elicited at the suppression hearing that there was suspicion that he had stolen the vehicle or that the fbi had done a records check and that this there was a report of the ford edge being stolen or that agent pullout ever suspected that it was stolen or being driven without the owner's permission was there any information about that in the record no your honor there was no evidence uh in that regard there is no evidence whatsoever with regard to the lawfulness of the possession i think that's the crux of the biscuit with regard to that's not true that's not true you're you're ignoring common sense if this car has been gone from the owner for months and reported stolen and this person is openly using it for that period of time and as soon as he's arrested he says return this to so and so that's pretty good evidence that it was with the permission of the owner i would believe it i would be convinced by it maybe another fact finder wouldn't but don't say there's no evidence i think that ignores common sense what am i missing you know i think i would point to valdez hawker as an example of why maybe that's not true and valdez hawker the defendant testified and he was able to elicit a specific relationship with regard to the owner the person that possessed the vehicle and himself and therefore there was specifical specific identifiable information that there was at least some sort of lawful possession and or uh based on the relationship he could reasonably believe that it was lawful here there's just no evidence and i think we're left guessing for a lot of these things because a reasonable mind could disagree with you and could possibly argue that uh either uh the registered owner was under duress for some reason didn't feel comfortable reporting it uh because of the the nature of the community in which he lives uh you know involving law enforcement is frowned upon in some communities and then it could have just been stolen and maybe no one noticed um so i think there is a lack of evidence with regard to the lawfulness of the possession and as a result the defendant hasn't met his burden and again it was his burden to prove that i'm in flight i read somewhere that that that he there was evidence that he started driving the car and that some other member of the the uh drug trafficking organization had driven the car before him is that right that is correct your honor there was evidence that the prior owner of the car was a member of the same uh drug trafficking uh organization and where did that where did that information come out and was that available to the district court it was it was in the suppression hearing and it came from special agent pollack and i believe it was during mr ray's cross-examination of him before you're off of here um let me let me ask one logistical question what is exhibit 25 and 26 that were the subject of of the the last issue i guess which relates to the belatedly introduced information what was 25 and 26 i don't recall specifically off the top of my head your honor that information in general involved uh three things text messages pictures retrieved from a phone and then jail calls were generally involved in that issue i don't remember specifically which numbers correspond to which okay because i knew i knew what 20 was i know what 22 was i thought 26 was the other phone of samaniego or something but all right i'll figure it out uh and to to pivot to that issue briefly your honor it was your time has expired does uh anyone have questions or want them to questions i'll give you a minute to address some other issue that you think we need to understand better mr fitzpaher your honor barring any additional questions from the court um i won't take that grant of time and i appreciate it and i would just ask that the court affirm the district court and all the issues presented here today thank you for your time thank you uh thank you so case is submitted and council are excused